IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:23 cr 156 -MOC |
| | ) | |
| v. | ) | **BILL OF INFORMATION** |
| | ) | |
| JEANNETTA BLACKMON | ) | 18 U.S.C. § 1343 |
| a/k/a "Jeannetta Regan" | ) | 18 U.S.C. § 1957 |
| | ) | |
| _____ | ) | |

## THE UNITED STATES ATTORNEY CHARGES:

At all relevant times:

### Introduction

1.  Beginning in April 2020, JEANNETTA BLACKMON, also known as "Jeannetta Regan," executed a scheme to fraudulently obtain Paycheck Protection Program ("PPP") and Economic Injury Disaster Loan ("EIDL") funds (collectively, "relief funds"), both personally and on behalf of other businesses ("customers") located in the Western District of North Carolina, and elsewhere.

2.  BLACKMON, using false information, including false financial information, employment data, bank statements, articles of organizations, and tax returns, among others, submitted and caused to be submitted false and fraudulent loan applications to the United States Small Business Administration ("SBA") and third-party participating lenders ("SBA approved lenders") on behalf of herself and customers in an attempt to obtain relief funds. As a result of the fraudulent applications, BLACKMON obtained more than $1.5 million in relief funds for herself and her customers.

### Defendant and Her Related Entities

3.  Defendant BLACKMON was a resident of Charlotte, North Carolina, within the Western District of North Carolina.

4.  BLACKMON controlled various entities, including J Renee Enterprises, LLC, Jeannetta Renee Girls Talk (JR Girls Talk), and Jrenee Investments (JR Investments), all of which were registered in North Carolina. Some of these entities had bank accounts which BLACKMON controlled.

### The Paycheck Protection Program

5.  The PPP was a COVID-19 pandemic relief program administered by the SBA that provided forgivable loans to small businesses for job retention and certain other expenses. The

PPP permitted participating SBA approved lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic. PPP loans were fully guaranteed by the SBA.

6.    To obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan, including that the business was in operation and either had employees for whom it paid salaries and payroll taxes or paid independent contractors. A business applying for a PPP loan was generally required to provide documentation showing its payroll expenses, such as filed federal income tax documents. The business must have existed in an operational condition on or before February 15, 2020.

7.    The proceeds of a PPP loan could be used for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, or mortgage interest payments. The proceeds of a PPP loan were not permitted to be used by the borrowers to purchase consumer goods, automobiles, personal residences, clothing, jewelry, to pay the borrower's personal federal income taxes, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

8.    A loan applicant could hire a PPP agent to be an authorized representative to prepare his or her application for financial assistance from the SBA and its certified lenders. A PPP agent was paid directly by the lender for providing loan preparation services. To receive a loan preparer fee from a lender, the PPP agent had to indicate their information in the PPP loan application documents. The total amount that a PPP agent could collect from the lender for assisting with a PPP loan application (including referral to the lender) could not exceed one (1) percent for loans of not more than $350,000, a half (0.50) percent for loans of more than $350,000 and less than $2 million, and a quarter (0.25) percent for loans of at least $2 million. The SBA prohibited PPP agents and lenders from collecting any fees from an applicant.

## The Economic Injury Disaster Loan Program

9.    The Coronavirus Aid, Relief, and Economic Security Act ("CARES" Act) was a federal law enacted on March 27, 2020, designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

10.    The provisions of the CARES Act, in conjunction with an officially declared disaster by the United States Government, allowed the SBA to offer Economic Injury Disaster Loan ("EIDL") funding to business owners negatively affected by COVID-19. Through the SBA online portal, EIDL applicants could submit personal and business information in support of an EIDL application.

11.     An EIDL application included a paragraph where the applicant affirmed that the information submitted was true and correct under the penalty of perjury and other applicable criminal statutes. The application process involved filling out data fields relating to the size of the affected business entity, the ownership of the business, the number of employees, and gross revenues realized in the 12 months prior to COVID-19's impact on the national economy. The business must have existed in an operational condition on or before January 31, 2020.

12.     The EIDL application information, submitted by the applicant, was then used by SBA systems to calculate the amount of money the business was eligible to receive in the form of a loan. The SBA Office of Disaster Assistance, an executive branch agency, had authority over all loans created and disbursed under the EIDL program. EIDLs were solely funded by the SBA and disbursed from government-controlled accounts maintained with the U.S. Treasury at Federal Reserve Banks throughout the United States.

13.     EIDL proceeds could only be used for working capital to pay expenditures necessary to alleviate the specific economic injury the small business suffered due to COVID-19. Covered expenditures included fixed debts, payroll, accounts payable, and other ordinary and necessary financial obligations that the business cannot meet as a direct result of the pandemic. EIDL proceeds could not be used to replace lost sales or profits or to expand a business. If the applicant also obtained a PPP loan, the EIDL funds could not be used for the same purpose as the PPP funds.

14.     EIDL Advance was a grant program offered together with the EIDL program. The amount of the advance issued to the small business applicant was determined by the number of employees indicated on the EIDL application, $1,000 per employee, up to $10,000.

15.     A loan applicant could hire an agent to prepare an EIDL application ("EIDL agent"). An EIDL agent was paid directly by the applicant for providing loan preparation services. To receive a loan preparer fee from an applicant, the EIDL Intake Application had to include the fee charged or agreed upon by the applicant and the EIDL agent. The EIDL Loan Agreement required the Borrower to certify that no fees had been paid, directly or indirectly, to any representative for services provided in connection with applying for or closing the EIDL loan, other than those reported on the EIDL loan application. If the compensation exceeded $2,500 for a disaster business loan, the Borrower had to fill out a Compensation Agreement Form 159D.  All fees not approved by the SBA were prohibited.

### The PPP and EIDL Fraud Scheme

16.     Between in or about April 2020 and in or about November 2021, BLACKMON, and others known and unknown, engaged in a scheme to defraud the SBA and SBA-approved lenders of more than $1.5 million to unjustly enrich herself by obtaining relief funds by means of materially false and fraudulent pretenses, representations, and promises.

### *PPP and EIDL Fraud Scheme for BLACKMON's Businesses*

17.     It was part of the scheme that BLACKMON knowingly submitted, and caused to be submitted, PPP loan and EIDL applications and supporting documents for her businesses, J Renee Enterprises, Jeannetta Renee Girls Talk (JR Girls Talk), and Jrenee Investments (JR Investments), that contained materially false statements and misrepresentations regarding her businesses' income, gross revenues, expenses, and number of employees, among others. BLACKMON also created and attached, and caused to be created and attached, to the applications as supporting documents, fabricated bank statements, and checks, among others. BLACKMON caused more than $319,000 in fraudulently obtained relief funds to be disbursed to bank accounts she controlled. For example:

      a.     On or about August 8, 2020, BLACKMON submitted, and caused to be submitted, a PPP application in the name of JR Investments to the SBA Approved Lender #1 ("Application 8639"). In connection with Application 8639, BLACKMON falsely affirmed, or caused to be falsely affirmed, that JR Investments had 7 employees and $8,334 in average monthly payroll.  BLACKMON also submitted a fabricated bank statement, check, and a 2019 tax return with the application.

      b.     On or about October 12, 2021, BLACKMON submitted, and caused to be submitted, an EIDL application in the name of J Renee Investments to the SBA ("EIDL Application 5872"). In connection with EIDL Application 5872, BLACKMON falsely affirmed, or caused to be falsely affirmed that J Renee Investments had actual 2019 gross revenues of $125,000, actual 2020 gross revenues of $275,000, and 3 employees.

### *PPP and EIDL Fraud Scheme for BLACKMON's Customers' Businesses*

18.     It was part of the scheme that BLACKMON, in exchange for more than $300,000 in loan preparation fees, knowingly submitted, and caused to be submitted, PPP loan and EIDL applications and supporting documents on behalf of customers known and unknown that contained materially false statements and misrepresentations regarding her customers' businesses, business income, gross revenue, expenses, and number of employees. BLACKMON also created and attached, and caused to be created and attached, to the applications as supporting documents, fabricated bank statements, checks, articles of organization, and tax returns, among others. BLACKMON caused more than $1.2 million in fraudulently obtained relief funds to be disbursed to her and her customers' bank accounts.  For example:

      a.     On or about August 8, 2020, BLACKMON submitted, and caused to be submitted, an EIDL application in the name of Business #1 to the SBA ("EIDL Application 4264"). In connection with EIDL Application 4264, BLACKMON falsely affirmed, or caused to be falsely affirmed that Business #1 had actual 2019 gross revenues of $285,000 and 3 employees.

      b.     On or about January 23, 2021, BLACKMON submitted, and caused to be submitted, a PPP application in the name of Business #2 to SBA Approved Lender #2

("Application 0133"). In connection with Application 0133, BLACKMON falsely affirmed, or caused to be falsely affirmed, that Business #2 had 1 employee and $11,500 in average monthly payroll. BLACKMON also submitted a fabricated bank statement and 2019 tax return with the application.

19. It was further part of the scheme that BLACKMON received loan preparer fees prohibited by the SBA. BLACKMON directed her customers to pay her loan preparation fees in checks or peer-to-peer payments, which were then deposited into bank accounts controlled by BLACKMON. BLACKMON failed to report any of her loan preparation fees on her 2020 or 2021 federal income tax returns filed with the Internal Revenue Service. BLACKMON's fees were far in excess of what was permitted by the SBA. For example:

    a. On or about September 29, 2020, a check for $30,000 from Customer A was deposited into BLACKMON's J Renee Enterprises Wells Fargo Account x5279.

20. In order to continue the fraudulent scheme and to avoid detection, BLACKMON misrepresented, concealed, and hid, and caused to be mispresented, concealed, and hidden, the purposes of the scheme and acts done in furtherance of the scheme.

## COUNT ONE
### (18 U.S.C. §1343 - Wire Fraud)

21. The United States Attorney realleges and incorporates by reference herein, all of the allegations contained in paragraphs 1 through 20 of the Bill of Information, and further alleges that:

22. From in or about April 2020 through in or about November 2021, in the Western District of North Carolina and elsewhere, the defendant,

JEANNETTA BLACKMON

with the intent to defraud, did knowingly and intentionally devise the above-described scheme and artifice to defraud and to obtain money and property by materially false and fraudulent pretenses, representations, and promises, and by concealment of materials facts, and for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communication in interstate commerce any writing, signal, picture, and sound, to wit, electronic loan applications, wire transfers, and other electronic financial transactions in interstate commerce.

All in violation of Title 18, United States Code, Section 1343.

## **COUNT TWO**
(18 U.S.C. § 1957 - Engaging in Monetary Transactions in Criminally Derived Property)

23.     The United States Attorney realleges and incorporates by reference herein, all of the allegations contained in paragraphs 1 through 20 of the Bill of Information, and further alleges that:

24.     On or about about December 29, 2020, in the Western District of North Carolina and elsewhere, the defendant,

### JEANNETTA BLACKMON

did knowingly engage and attempt to engage in a monetary transaction by, through and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, money deposits which represented fraudulently obtained disaster-related loan proceeds, such property having been derived from a specified unlawful activity, that is, wire fraud, *to wit*, a transfer from the J Renee Enterprises Wells Fargo Account x5279 in the amount of $45,800 to the J Renee Enterprises Wells Fargo Account x5287.

All in violation of Title 18, United States Code, Section 1957.

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offense for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981, and all specified unlawful activities listed or referenced in 18 U.S.C. §1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

    a. All property which constitutes or is derived from proceeds of the violations set forth in Count One of this Bill of Information;

    b. All property involved in the violations of Count Two, or traceable to property involved in such violation; and

    c. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) and (b) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant's to the extend of the value of the property described in (a) and (b).

The following property is subject to forfeiture on one or more of the grounds stated above:

    a. A forfeiture money judgment in the amount of at least $1,675,328.60, such amount constituting the proceeds of property involved in the violations.

DENA J. KING
UNITED STATES ATTORNEY

*Caryn Finley*

_____

CARYN FINLEY
ASSISTANT UNITED STATES ATTORNEY